IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| **DEWOLFF, BOBERG &** | § | |
| **ASSOCIATES, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. **3:20-CV-3649-L** |
| | § | |
| **JUSTIN PETHICK and THE** | § | |
| **RANDALL POWERS COMPANY,** | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Before the court are the following motions filed on July 21, 2023: Defendant Justin Pethick's Motion for Summary Judgment (Doc. 153); Defendant The Randall Powers Company's Motion for Summary Judgment (Doc. 155); Plaintiff DeWolff, Boberg & Associates, Inc.'s Motion for Summary Judgment on Defendant The Randall Power Company's Claim for Attorney's Fees (Doc. 157); and Defendants Justin Pethick and The Randall Powers Company's Daubert Motion to Exclude Stuart B. Miller, Ph.D.'s Report, Opinions, and Testimony (Doc. 158). For the reasons herein explained, the court **grants** Defendants Justin Pethick and The Randall Powers Company's Daubert Motion to Exclude Stuart B. Miller, Ph.D.'s Report, Opinions, and Testimony (Doc. 158); **grants** Defendant Justin Pethick's Motion for Summary Judgment (Doc. 153); **grants** Defendant The Randall Powers Company's Motion for Summary Judgment (Doc. 155); and **denies without prejudice** Plaintiff DeWolff, Boberg & Associates, Inc.'s Motion for Summary Judgment on Defendant The Randall Power Company's Claim for Attorney's Fees (Doc. 157).

**Memorandum Opinion and Order – Page 1**

## I.    Factual and Procedural Background

DeWolff, Boberg & Associates, Inc. ("Plaintiff," "DB&A," or "DeWolff") originally brought this action against former employee Justin Pethick ("Mr. Pethick") in the 401st Judicial District Court, Collin County, Texas, on June 10, 2020, for breach of contract and fiduciary duty. Mr. Pethick removed the case to federal court on July 9, 2020.  On October 23, 2020, Plaintiff filed a First Amended Complaint (Doc. 22) in which it again asserts causes of action against Mr. Pethick for breach of contract and breach of fiduciary duty, and it also asserts a cause of action for unjust enrichment. On November 12, 2020, Mr. Pethick filed his Answer (Doc. 25) to the First Amended Complaint.  At his request, the case was then transferred on December 16, 2020, from the Eastern District of Texas, Sherman Division, to the Northern District of Texas, Dallas Division.

Several months later, on November 2, 2021, the court granted Plaintiff's request to join as a defendant The Randall Powers Company ("Powers"), Mr. Pethick's new employer, and directed the clerk of the court to file Plaintiff's Second Amended Complaint (Doc. 95).[1]  Plaintiff's Second Amended Complaint includes nine counts:

- Count 1: breach of contract (against Mr. Pethick)
- Count 2: breach of fiduciary duty (against Mr. Pethick)
- Count 3: misappropriation of trade secrets (against both Defendants)
- Count 4: aiding and abetting breach of fiduciary duties (against Powers)
- Count 5: aiding and abetting misappropriation of trade secrets (against Powers)
- Count 6: tortious interference with existing contract (against Powers)
- Count 7: tortious interference with prospective relations (against both Defendants)
- Count 8: conspiracy (against both defendants)
- Count 9: unjust enrichment (against both defendants)

While the Second Amended Complaint includes more causes of action, the allegations in the Second Complaint supporting the claims against Mr. Pethick are largely the same as those included

---

[1] The court refers to Mr. Pethick and Powers collectively as "Defendants."

**Memorandum Opinion and Order – Page 2**

in the First Amended Complaint to which he filed an Answer. Plaintiff's Second Amended Complaint is the operative pleading for purposes of resolving the parties' summary judgment and expert motions because, as the court herein explains, it struck Plaintiff's Third Amended Complaint and subsequently denied a motion for leave by Plaintiff to file its proposed Third Amended Complaint.

DeWolff alleges that it is a global management consulting company headquartered in Dallas, Texas, that has provided cross-industry management consulting services to companies since 1987. All of the claims asserted by DeWolff stem from its allegation that Mr. Pethick not only began working in the same sales position for Powers while he was still employed by DeWolff, but that he also began actively calling and soliciting DeWolff clients on behalf of Powers. Plaintiff alleges that such conduct violated the fiduciary duties he owed DeWolff, as well as the nonsolicitation, nondisclosure, and noncompetition clauses in the Non-Disclosure Agreement ("NDA") and Employee Service and Non-Competition Agreement ("Employment Agreement") that he signed when he joined DeWolff in October 2018. In addition, DeWolff alleges that Mr. Pethick disclosed and used confidential information pertaining to DeWolff's business and clients for his own benefit and that of Powers, and, in doing so, misappropriated DeWolff's trade secrets and committed other various torts.

Plaintiff alleges that Powers and DeWolff are direct competitors, and that "Powers was founded by a former [DeWolff] employee, Randall Powers, to compete with [DeWolff] by providing the same services pursuant to the same business model that [DeWolff] had developed for decades prior." Pl.'s Second Am. Compl. ¶ 18. For this and other reasons, Plaintiff asserts that Powers was well aware of Mr. Pethick's conduct, knew that his conduct violated his contractual

and fiduciary obligations to DeWolff, and actively participated in the alleged tortious conduct and misappropriation of DeWolff's confidential information and trade secrets for its own benefit.

In response to Plaintiff's Second Amended Complaint, Mr. Pethick and Powers both filed motions to dismiss and motions for more definite statements, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 12(e). On September 29, 2022, the court denied Defendants' Motions for More Definite Statement as to Plaintiff's claim for misappropriation of trade secrets and granted in part and denied in part their Motions to Dismiss as follows:

> Powers' Motion to Dismiss (Doc. 109) is **granted** with respect to Plaintiff's claims and theories of relief based on conspiracy (Count 8) and unjust enrichment (9) as preempted by TUTSA. Powers' Motion to Dismiss as to Plaintiff's claim for aiding and abetting misappropriation of trade secrets is also **granted**, as this claim was withdrawn (Count 5) by Plaintiff. Pl.'s Resp. 6 n.1. Accordingly, Plaintiff's claims against Powers for aiding and abetting misappropriation of trade secrets (Count 5), conspiracy (Count 8), and unjust enrichment (9) are **dismissed with prejudice.** Powers' Motion to Dismiss is **denied** in all other respects, except to the extent that the court determined that Plaintiff's claims for aiding and abetting breaches of fiduciary duty (Count 4) and tortious interference with prospective relations (Count 7) are based in part on the misappropriation of a trade secret and thus preempted in part.

> Mr. Pethick's Motion to Dismiss (Doc. 98) is **granted** with respect to Plaintiff's claim for conspiracy (Count 8) because it is preempted by TUTSA, and this claim against him is **dismissed with prejudice**. His Motion to Dismiss is **denied** in all other respects, except to the extent that the court determined that Plaintiff's claims for tortious interference with prospective relations (Count 7) is based in part on the misappropriation of a trade secret and thus preempted in part.

Sept. 29, 2022 Mem. Opin. & Order (Doc. 129). "TUTSA" refers to the Texas Uniform Trade Secrets Act.

Thereafter, the parties filed their current motions in which Defendants seek: (1) to strike the testimony of Plaintiff's Rule 702 damages expert as unreliable; and (2) summary judgment on all remaining claims against them in this action. Plaintiff also move for partial summary judgment on the issue of whether Power is entitled to recover attorney's fees. For the reasons that follow,

the court determines that the testimony of Plaintiff's damages expert should be stricken; that Defendants are entitled to judgment as a matter of law with respect to Plaintiff's remaining claims; and that the issue raised by Plaintiff regarding attorney's fees can be addressed postjudgment.

## II.   Defendants' Motion to Strike Expert Report, Opinions, and Testimony (Doc. 158)

### A.   Rule 702 Legal Standard

In a diversity case, the admissibility of evidence is a procedural issue governed by federal law. *See Reed v. General Motors Corp.*, 773 F.2d 660, 663 (5th Cir. 1985). Federal Rule of Evidence 702, as amended on December 1, 2023, governs the admissibility of expert testimony and provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The trial court acts as a "gatekeeper" to ensure that "any and all scientific evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. "*Daubert*'s general holding—setting forth the trial judge's general 'gatekeeping' obligation—applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge" that is non-scientific in nature. *Kumho Tire Co. v. Carmichael*, 526 U.S.

137, 141 (1999).[2] In its gatekeeping role, the court determines the admissibility of expert testimony based on Rule 702, *Daubert*, and its progeny.[3]

"The court may admit proffered expert testimony only if the proponent . . . demonstrates that (1) the expert is qualified, (2) the evidence is relevant to the suit, and (3) the evidence is reliable." *E.E.O.C. v. S & B Indus., Inc.*, No. 3:15-CV-641-D, 2017 WL 345641, at *2 (N.D. Tex. Jan, 24, 2017) (citing *Kumho Tire Co.*, 526 U.S. at 147) (internal quotation marks omitted). The burden is on the proponent of the expert testimony to establish its admissibility by a preponderance of the evidence. *See Daubert*, 509 U.S. at 592 n.10; *Johnson v. Arkema, Inc.*, 685 F.3d 452, 459 (5th Cir. 2012); Fed. R. Evid. 702 advisory committee's notes (2023 amendments). The court's inquiry is flexible in that "[t]he relevance and reliability of expert testimony turn[] upon its nature and the purpose for which its proponent offers it." *United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010) (citation omitted).

To be relevant, "expert testimony [must] 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 245 (5th Cir. 2002) (quoting *Daubert*, 509 U.S. at 591). "Relevance depends upon 'whether [the expert's] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 593); *see also* Fed. R. Evid.

---

[2] In *Kumho Tire*, the Supreme Court resolved a split among the circuits and held that *Daubert*'s "gatekeeping" function applied to all expert opinion testimony based on specialized knowledge, not merely scientific expert testimony. Before *Kumho Tire*, the Fifth Circuit had held that *Daubert* applies to expert testimony based on engineering principles and practical experience. *See Watkins v. Telsmith, Inc*., 121 F.3d 984, 988 (5th Cir.1997).

[3] The amendments to Federal Rule of Evidence 702, effective December 1, 2000, essentially codify *Daubert* and *Kumho Tire*. The Advisory Committee's note to Rule 702 states that the determination of whether an expert's opinions are reliable if based upon sufficient facts or data calls for a "quantitative rather than qualitative analysis." In addressing this issue, the "question is whether the expert considered enough information to make the proffered opinion reliable. . . . The expert must base [his or her] opinion on at least the amount of data that a reliable methodology demands." 29 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 6268 (2d ed. 1987). Further, in reviewing a *Daubert* challenge, the court makes no credibility determinations; it only decides whether the threshold reliability standards have been satisfied. *See* Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

702(d) (requiring that an "expert has reliably applied the principles and methods to the facts of the case").

"Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.'" *Knight*, 482 F.3d at 352 (quoting *Daubert*, 509 U.S. at 592-93); *see also* Fed. R. Evid. 702(c) (requiring that "testimony [be] the product of reliable principles and methods"). "The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, *et alia*." *Knight*, 482 F.3d at 355 (citation and internal quotation marks omitted). While "there is no requirement that an expert derive his opinion from firsthand knowledge or observation," *Deshotel v. Wal–Mart La., L.L.C.*, 850 F.3d 742, 746 (5th Cir. 2017) (internal quotation marks omitted), "[t]he reliability prong mandates that expert opinion be grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted).

"The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595; *Williams v. Manitowoc Cranes, L.L.C.*, 898 F.3d 607, 623 (5th Cir. 2018) (quoting *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004)). "The proponent need not prove to the judge that the expert's testimony is correct, but [it] must prove by a preponderance of the evidence that the testimony is reliable." *Johnson*, 685 F.3d at 459 (internal quotation marks omitted). On the other hand, if "there is simply too great an analytical gap between the [basis for the expert opinion] and the opinion proffered," the court may exclude the testimony as unreliable, as "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

When conducting a reliability analysis, courts consider the following non-exclusive list of factors:

> (1) whether the theory or technique has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the method used and the existence and maintenance of standards controlling the technique's operation; and (4) whether the theory or method has been generally accepted by the scientific community.

*Johnson*, 685 F.3d at 459 (internal quotation marks omitted). These factors are not definitive or exhaustive. In conducting the *Daubert* analysis, courts have discretion in determining which factors are most germane in light of the nature of the issue, the particular expertise, and the subject of the expert's testimony. *Daubert*, 509 U.S. at 593-95; *Kumho Tire Co.*, 526 U.S. at 142.

The Advisory Committee's Notes to Rule 702 contemplate that expert testimony may be based on experience, training, or both:

> Nothing in this amendment is intended to suggest that experience alone— or experience in conjunction with other knowledge, skill, training or education— may not provide a sufficient foundation for expert testimony. To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony. *See, e.g., United States v. Jones*, 107 F.3d 1147 (6th Cir. 1997) (no abuse of discretion in admitting the testimony of a handwriting examiner who had years of practical experience and extensive training, and who explained his methodology in detail); *Tassin v. Sears Roebuck*, 946 F. Supp. 1241, 1248 (M.D. La. 1996) (design engineer's testimony can be admissible when the expert's opinions "are based on facts, a reasonable investigation, and traditional technical/mechanical expertise, and he provides a reasonable link between the information and procedures he uses and the conclusions he reaches"). *See also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167, 1178 (1999) (stating that "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

The Advisory Committee's Notes to Rule 702 further explain: "If the witness is relying solely or primarily on experience, then [he or she] must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that

experience is reliably applied to the facts." *Id.* This is because the "trial court's gatekeeping function requires more than simply taking the expert's word for it" that the claimed basis supports the opinion. *Id.* (citation and internal quotation marks omitted); *Pipitone*, 288 F.3d at 245-47 (finding expert testimony reliable when the expert explained how his experience in the field led him to opine that an absence of contamination of some samples did not undermine his conclusion that the plaintiff's infection came from the same drug). Overall, the trial court must strive to ensure that the expert, "whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. The relevance and reliability of expert testimony turn upon the nature of the testimony and the purpose for which the proponent offers the testimony. *See, e.g., Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 195 (5th Cir. 2006) ("Of course, whether a proposed expert should be permitted to testify is case, and fact, specific.") (citing *Kumho Tire*, 526 U.S. at 150-51).

The district court's gatekeeping role is not meant "to serve as a replacement for the adversary system: Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Primrose Operating Co. v. National Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (quoting *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996)); *accord Williams*, 898 F.3d at 624 (quoting *Daubert*, 509 U.S. at 596). Thus, the district court's "*Daubert* analysis should not supplant trial on the merits," *Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002) (citation omitted), and, *generally*, issues regarding the bases and sources of an expert's opinion that affect the weight of an opinion rather than the admissibility of the opinion "should be left for the [trier of fact's]

consideration." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 422 (5th Cir. 1987). The reasoning behind this general rule is consistent with the Advisory Committee's Notes to Rule 702, which state:

> When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

Fed. R. Evid. 702 advisory committee's notes (2000 amendments).

The court previously emphasized the word *generally* because the 2023 amendments to Rule 702 explain that issues pertaining to the sufficiency of facts or data relied upon by an expert and the sufficiency of an expert's bases do not always concern questions of weight that should be left to the jury:

> [M]any courts have held that the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility. These rulings are an incorrect application of Rules 702 and 104(a).
> . . . .
> The amendment clarifies that the preponderance standard applies to the three reliability-based requirements added in 2000—requirements that many courts have incorrectly determined to be governed by the more permissive Rule 104(b) standard. But it remains the case that other admissibility requirements in the rule (such as that the expert must be qualified[,] and the expert's testimony must help the trier of fact) are governed by the Rule 104(a) standard as well.
>
> Some challenges to expert testimony will raise matters of weight rather than admissibility even under the Rule 104(a) standard. For example, if the court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility. But this does not mean, as certain courts have held, that arguments about the sufficiency of an expert's basis always go to weight and not admissibility. Rather it means that once the court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence.

Fed. R. Evid. 702 advisory committee's notes (2023 amendments).

Additionally, the 2023 amendments to Rule 702 "emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology," particularly when dealing with forensic expert testimony:

> Rule 702(d) has also been amended to emphasize that each expert opinion must stay within the bounds of what can be concluded from a reliable application of the expert's basis and methodology. Judicial gatekeeping is essential because just as jurors may be unable, due to lack of specialized knowledge, to evaluate meaningfully the reliability of scientific and other methods underlying expert opinion, jurors may also lack the specialized knowledge to determine whether the conclusions of an expert go beyond what the expert's basis and methodology may reliably support.

> **The amendment is especially pertinent to the testimony of forensic experts in both criminal and civil cases. Forensic experts should avoid assertions of absolute or one hundred percent certainty—or to a reasonable degree of scientific certainty—if the methodology is subjective and thus potentially subject to error. In deciding whether to admit forensic expert testimony, the judge should (where possible) receive an estimate of the known or potential rate of error of the methodology employed, based (where appropriate) on studies that reflect how often the method produces accurate results. Expert opinion testimony regarding the weight of feature comparison evidence (i.e., evidence that a set of features corresponds between two examined items) must be limited to those inferences that can reasonably be drawn from a reliable application of the principles and methods. This amendment does not, however, bar testimony that comports with substantive law requiring opinions to a particular degree of certainty.**

> Nothing in the amendment imposes any new, specific procedures. Rather, the amendment is simply intended to clarify that Rule 104(a)'s requirement applies to expert opinions under Rule 702. Similarly, **nothing in the amendment requires the court to nitpick an expert's opinion in order to reach a perfect expression of what the basis and methodology can support. The Rule 104(a) standard does not require perfection. On the other hand, it does not permit the expert to make claims that are unsupported by the expert's basis and methodology.**

*Id.* (emphasis added).

### B.    The Parties' Arguments

Defendants move to strike the testimony of Stuart B. Miller, Ph.D., Plaintiff's damages expert, on the grounds that it is unreliable because: (1) he did not consider causation in calculating

lost profits; (2) he failed to apportion Plaintiff's alleged damages and isolate revenue that was lost but-for the alleged trade secret misappropriation; and (3) his risk-adjustment model and methodology are unsupported, unreliable, and overstate Plaintiff's alleged damages.

The court agrees with Defendants that Dr. Miller's testimony is unreliable and focuses on Defendants' third ground, as it is dispositive of their request to strike Dr. Miller's testimony regarding the damages Plaintiff allegedly suffered in connection with its claim for misappropriation of trade secrets. Regarding their third ground, Defendants contend that the risk-adjustment theory to Dr. Miller's lost profits analysis is "untethered from the case or any reliable modeling theory." Defs.' Br. 12 (Doc. 159). Defendants note that Dr. Miller acknowledges that Plaintiff may not have secured business with the three companies at issue—Arcosa, Beyond Meat, and Sechan [4]—even in the absence of Defendants' alleged misappropriation of trade secrets. Defendants also note that Dr. Miller accounts for this risk by applying a discount rate of 20.61 percent to 21.82 percent based on his application of a modified capital asset pricing model or "CAPM" to calculate lost profits. Defendants, however, argue that the CAPM was developed to value the risk of venture capital returns, and there is no indication that it has ever been applied in a case like the one before the court to calculate the lost profit damages or peer approved for such an application. Defendants, therefore, argue that application of the CAPM in this case is not a reliable method for evaluating the risk of securing the three individual accounts for purposes of calculating Plaintiff's corresponding damages for alleged lost profits.

Defendants further argue that, even if the CAPM discount model applies to cases like this case, the data relied on by Dr. Miller is not reliable because, for example, the Pepperdine Study

---

[4] Arcosa, Beyond Meat, and Sechan are the three customers that Plaintiff allegedly lost as a result of Defendants' conduct.

relied on by him and the rates of return discussed in that study are for "later stage venture capital

investors." *Id.* at 13.   In addition, Defendants contend that Dr. Miller relies on expected capital

return rates from 13 to 18 years before his earliest valuation date.   Defendants consequently assert

that Dr. Miller's testimony should be excluded as unreliable because:

> [i]t is not grounded in methods and procedures of science and does not amount to
> more than unsupported speculation and subjective belief. There is too great an
> analytical gap between the basis of Dr. Miller's opinion and the opinion he proffers.
> The CAPM discount theory has not been tested or subjected to peer review in the
> context in which it has been applied. . . . Dr. Miller failed to consider or explain
> other evidence that conflicts with his analysis. Additionally, the analysis is
> irrelevant as a breach of contract-based model that is not related to the valuation or
> royalty rate for the purported trade secrets that were misappropriated.

*Id.* at 14.

Plaintiff disagrees that the methodology applied by Dr. Miller for calculating lost profit

damages is unreliable and summarizes his "benchmark or yardstick approach" as follows:

> [Dr.] Miller provided his expert report setting forth his opinions on April
> 10, 2023 (the "Miller Report"). To identify the but-for revenues, [Dr.] Miller
> applied a benchmark or yardstick approach and considered the revenues each client
> actually paid to Powers as the benchmark reference amount. *See* App'x at 28 &
> 109. The revenues recorded by Powers, a direct competitor to DB&A, for the three
> disputed clients were approximately $923,000 for Arcosa, $1.2 million for Beyond
> Meat, and $1.6 million for Sechan (*i.e.*, an average revenue of approximately $1.24
> million per project). [Dr.] Miller assessed the reasonableness of the benchmark
> against DB&A's average revenue per project of $1.2 million. *See* App'x at 37.
> [Dr.] Miller also evaluated the project length, dates of inception, and conclusion.
> *See* App'x at 27. [Dr.] Miller also verified that DB&A had available capacity to
> perform the disputed projects over the date range during which Powers provided
> services. *See* App'x at 37.   [Dr.] Miller also considered the reasonableness of the
> benchmark revenues by comparing the difference in average weekly fees charged
> by DB&A and Powers. *See* App'x at 28. In fact, because Powers' weekly fees are
> lower, the benchmark revenue amounts are conservative relative to DB&A's
> prevailing market rates for performing the same or similar work.
>
> [Dr.] Miller then made expense deductions for costs which DB&A would
> have incurred in performing the three disputed contracts. Specifically, [Dr.] Miller
> made deductions for "above the line" operating expenses which are incurred and
> deducted as part of identifying DB&A's gross profits. [Dr.] Miller made further

expense deductions for DB&A providing a 2-week assessment to each of the three clients and for certain "below the line" general and administrative expenses.

[Dr.] Miller then applied a discount rate to the lost net profits. The discount rate is determined using the well-established Capital Asset Pricing Model ("CAPM"). *See* App'x at 33-34. The purpose of applying this discount rate is two-fold. First, it discounts the lost net profits to their net present value at the date of harm. Second, it accounts for the riskiness associated with cash flows from each of the three disputed projects. [Dr.] Miller applies this step to consider, among other factors, uncertainty as to whether DB&A would have won the business with the disputed clients in the absence of the alleged wrongful conduct. *See* App'x at 33.

Defendants deposed [Dr.] Miller on June 21, 2023 ("Miller Deposition"). Despite [Dr.] Miller's undisputed qualifications and use of clear data and methodology to reach his opinions, Defendants filed their Daubert Motion to Exclude Stuart B. Miller, PH.D.'s Report, Opinions and Testimony on July 21, 2023 [Doc. 159].

Pl.'s Resp. 2-3.

Plaintiff notes that Defendants do not challenge Dr. Miller's use of the "but for" method, which they assert is a "widely . . . accepted method to compute damages for lost profits" that enables "the reconstruction of the business results that would have been achieved absent the improper conduct on the part of Defendants." Pl.'s Resp. 9 (citing *Union Oil Co. of Cal. v. Buffalo Marine Serv., Inc.*, No. 1:10-CV-195, 2012 WL 13034559, at *4 (E.D. Tex. Jan. 10, 2012), for the conclusion that: "damages expert that computed lost profits by estimating lost sales by calculating the revenue that would have been collected but for a given event and then subtracting actual sales [was] found to have reliable methodology"). Plaintiff asserts that, Defendants instead challenge Dr. Miller's use of the CAPM for calculating a discount rate to apply to his "but for" analysis on the grounds that it is not reliable. Plaintiff contends that Defendants fail to cite any legal authority holding that the CAPM is an unacceptable method for calculating a discount rate and offer no alternative method that should have been applied by Dr. Miller. Additionally, Plaintiff contends that "Defendants' assertion that the purpose of 'the CAPM rate is to value venture capital

investments in books of business' is simply wrong and demonstrates a fundamental misunderstanding of the CAPM." Pl.'s Resp. 10 n.3 (quoting Defs.' Br. at 13).

According to Plaintiff, the CAPM is a recognized methodology of calculating a discount rate that is widely regarded by courts to be an acceptable method to determine cash flow. Pl.'s Resp. 10 (citing *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 360 n.88 (S.D. Tex. 2008), as "upholding expert's decision to use CAPM to determine cash flow"; quoting *Steiner Corp. v. Benninghoff*, 5 F. Supp. 2d 1117, 1132 (D. Nev. 1998), for the conclusion that "[p]robably the most accepted way to calculate the discount rate, at least for discounting cash flows, is the Capital Asset Pricing Model ('CAPM')"; and quoting *Hodas v. Spectrum Tech., Inc.*, No. 11,265, 1992 WL 364682, at *3 (Del. Ch. Dec. 8, 1992), for the conclusion that "[t]he CAPM is a generally accepted method of determining a company's cost of equity by reference to the risk free rate of return, the market risk premium and the risk differential between investment in a particular industry or company and investment in a diversified portfolio of stocks.").

Plaintiff contends that, in any event, Defendants' objections to the authorities relied on by Dr. Miller and his application of the CAPM to determine the discounted cash flow do not render his testimony inadmissible; rather, these are issues that can be addressed on cross-examination. Pl.'s Resp. 10 (citing *ASARCO LLC*, 396 B.R. at 360 n.88, for the conclusion that "expert's decision to use 'the capital asset pricing model (or the build-up model) instead of the Fama-French method to determine the discounted cash flow [did] not render [expert] opinions inadmissible.").

Plaintiff next contends that Dr. Miller's use of venture capital returns to estimate the specific risk premium in this case is also appropriate, and it asserts that Defendants offer no reason why it is not appropriate. Plaintiff further asserts that determining a discount rate is subjective and not an exact science and, therefore, experts can adopt different opinions "without being deemed

incorrect as a matter of law." *Id.* (quoting *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 364-65 (5th Cir. 2003); and quoting *Lary v. Boston Sci.Corp.*, No. 11-CV-23820, 2014 WL 7152769, at *13 (S.D. Fla. Dec. 15, 2014).[5]

Plaintiff, therefore, contends that Dr. Miller's testimony is admissible and Defendants' objections in this regard go to the weight, not admissibility of his testimony:

> Applying his experience and judgment, [Dr.] Miller correctly applies the CAPM and then increases the discount rate (referred to as the cost of equity) by application of a specific risk premium to capture any additional potential uncertainty with cash flows from Arcosa, Beyond Meat[,] and Sechan. Instead of assuming that the cash flows from the three disputed customers carry the same risk as [Plaintiff's] overall business (*i.e.*, use a discount rate equal to the cost of equity resulting from application of the CAPM), [Dr.] Miller applies a ***higher*** discount rate, considering venture capital target rates of return. The rate applied by [Dr.] Miller is a conservative estimate of the risk associated with the prospective cash flows from the three disputed customers. Because [Dr.] Miller properly applied his expertise and judgment to determine a proper discount rate, any objections to [his] testimony related to this issue should go to the weight not admissibility of such testimony.

Pl.'s Resp. 12 (other citations and footnotes omitted). Plaintiff asserts that "[a] higher discount rate results in a lower lost profits amount," *id.* n.5., and "applying a discount rate associated with venture capital firms provided a conservative estimate" of risk.[6]

Defendants counter that a review of the scholarly authorities cited in Dr. Miller's report and Plaintiff's response demonstrate that the CAPM, as applied by Dr. Miller using target venture capital returns to estimate the specific risk premium, is not appropriate to calculate DB&A's alleged lost profit damages because doing so results in an overstatement of lost profits rather than a conservative amount as urged by Plaintiff. Defendants further assert that these authorities show

---

[5] Plaintiff also quotes: Robert M. Lloyd, *Discounting Lost Profits in Business Litigation: What Every Lawyer and Judge Needs to Know*, 9 Tenn. J. Bus. L 9, 63 (2007).

[6] *Id.* at n.6 (citing Pl.'s App. 169-235, Aswath Damodaran, *Valuing Young, Start-up and Growth Companies: Estimation Issues and Valuation Challenges* (May 2009), http://people.stern.nyu.edu/adamodar/pdfiles/papers/younggrowth.pdf) (other citations and footnotes omitted).

that the CAPM is not suited for this kind of application because the CAPM only works as applied by Dr. Miller, without adjustment, to the "100 or so of the largest publicly traded companies," not small closely held companies like DB&A.  Defs.' Reply 9 (citing Pl.'s App. 151-62, Lloyd, *supra* note 5 at 48-59.).

Defendants contend that Plaintiff's reliance on Damodaran's article for valuing young, start-up companies is similarly misguided because it is illustrative of the fact that the model was misapplied in this case by Dr. Miller. In this regard, Defendants argues that Damodaran does not recommend using venture capital returns in developing the risk premium or discount rate and, instead, states that doing so results in valuation errors.  Defs.' Reply 9 (citing Pl.'s App. 170, Damodaran, *supra* note 6 at 2).  Defendants, therefore, argue that Dr. Miller's application of the CAPM in this case to calculate Plaintiff's lost profits damages using venture capital returns is not supported by industry practice. Defs.' Reply 10 (citing *Hoffman v. Comm'r*, 81 T.C.M. (CCH) 1588, 2001 WL 490399, at *13 (T.C. 2001) ("The use of CAPM is questionable when valuing small, closely held companies. . . . We do not believe that CAPM * * * [is] the proper analytical [tool] to value a small, closely held corporation with little possibility of going public. CAPM is a financial model intended to explain the behavior of publicly traded securities that has been subjected to empirical validation using only historical data of the two largest U.S. stock markets.")) (citations omitted).  Defendants assert that there is no indication that Dr. Miller has ever applied the CAPM in a trade secrets case, but even assuming that the CAPM could be appropriately applied in a trade secrets case such as this case, the authority relied on by Plaintiff and Dr. Miller unequivocally demonstrates that it was applied incorrectly in this case.

### C.     Discussion

As indicated, Rule 702 witnesses can testify based on experience. To be reliable, however, witnesses relying on experience "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts" in a particular case.  Fed. R. Evid. 702 advisory committee's notes (2000 amendments).  Dr. Miller does not state anywhere in his report that this opinions or his decision how to calculate Plaintiff's alleged lost profit damages is based on his experience.  In response to the question—"Are they concepts that you see in lost profits analysis in your experience?"—Dr. Miller states in his deposition: "Yes, they could be applied in that setting as well."  Pl.'s App. 106.  It is unclear from Plaintiff's evidence, however, what was meant by "concepts" or "[t]hey" since the portion of the deposition needed to put this question and answer into context is missing.  Dr. Miller's response is also conclusory.

Regardless, even assuming, as Plaintiff contends, that expertise and judgment appropriately played a role in Dr. Miller's determination regarding the discount rate and risk premium to be applied in this case, the court cannot simply take Plaintiff's or Dr. Miller's word that the claimed basis or bases support his opinions.  *Id.*  In other words, Dr. Miller's reliance on his experience and judgment does not relieve him from explaining how his experience led him to the conclusions reached, why his experience provides a sufficient basis for his opinions regarding the applicable discount rate and risk premiums, and how he reliably applied his experience to the facts in this case in arriving at a lost profit damages amount for Plaintiff's claim for misappropriation of trade secrets.  *Id.*  To conclude otherwise, would amount to the court finding the damages testimony and opinions admissible based on nothing more than the *ipse dixit* of Dr. Miller and Plaintiff's counsel, who in this case has attempted to fill the gaps in Dr. Miller's

testimony based on argument unsupported by his report, and by citation to legal authority and treatises. *General Elec. Co.*, 522 U.S. at 146. As noted, Plaintiff's response quotes to Lloyd's article on discounting,[7] but there is no indication from Dr. Miller's report that he relied on this article. Dr. Miller makes a passing reference in a footnote of his report to the Damodaran valuation article, but not necessarily for the reasons urged by Plaintiff.

The court has carefully reviewed Dr. Miller's expert report and the portions of the transcript of his deposition testimony relied on by the parties. His lengthy report is replete with calculations, and he identifies the data and information that he considered and the matters he assumed in evaluating and calculating Plaintiff's "but-for revenues" for Arcosa, Beyond Meat, and Sechan, but he does not explain the meaning or import of "but-for revenue"; why he used the "but-for revenue" method in calculating Plaintiff's lost profit damages; and whether this is a method that is recognized in his field or industry as appropriate for calculating lost profit damages based on lost business opportunities.[8] Recognizing this deficiency, Plaintiff, in an attempt to fill the gaps in Dr. Miller's report, argues—based on *Union Oil Company of California v. Buffalo Marine Service, Incorporated*—that the "but for" method is a widely accepted method for calculating lost profit damages that facilitates "the reconstruction of the business results that would have been achieved absent the improper conduct on the part of Defendants." Pl.'s Resp. 9 (citing *Union Oil Co. of Cal.*, 2012 WL 13034559, at *4. Plaintiff correctly notes that Defendants do not challenge Dr. Miller's use of the "but for" method,[9] but Dr. Miller's opinions regarding the applicable discount rate and risk premiums, which were objected to by Defendants, are similarly deficient.

---

[7] Lloyd, *supra* note 5.

[8] Pl.'s App. 28.

[9] In *Union Oil*, the defendant argued that the plaintiff's damages expert should be stricken because his testimony was based on unreliable and inadequate data. *Id.* The parties, however, stipulated that the "forecast sales" methodology

Regarding the discount rate and risk premiums, Dr. Miller states in his report as follows:

62. In performing my analysis, I have determined the value of DB&A's lost profits as of each date of harm, which requires an adjustment to account for their risk and timing. **To determine the value of DB&A's lost profits, I apply the discounted cash flow method**, a fundamental tool of financial valuation that expresses the value of expected cash flows – in this case, DB&A's lost profits – as of a certain date by discounting them to the date on which they are expressed. **I apply the Capital Asset Pricing Model ("CAPM") to estimate DB&A's discount rate**, which reflects the minimum return demanded by investors to accept the level of risk associated with DB&A. **Depending on the date of harm, the CAPM-based discount rate ranges from 6.56% to 7.76%.**

63. A CAPM-based discount rate only considers DB&A's exposure to market risk – that is, risk common to all companies – and does not consider the risk specific to DB&A's lost profits. Specifically, there is risk and uncertainty associated with DB&A securing an engagement with Arcosa, Beyond Meat, or Sechan in the absence of the alleged wrongful conduct. For example, I understand that industry competitors to DB&A include Powers as well as other firms such Proudfoot, Wano Carvalho and USC Consulting Group. Based on a discussion with Mr. Compton I understand that prospective customers may also elect not retain an outside consulting firm. **I have accounted for the possibility that DB&A may not have secured business with Arcosa, Beyond Meat, or Sechan in the absence of the alleged wrongful conduct and have added a specific risk premium to the CAPM-based discount rate to discount the potential lost profits as of the date of harm**.

---

used by the plaintiff's expert is a generally accepted in the industry as a method for calculating lost profits. *Id.* The court agreed with the plaintiff that its expert had considered the pertinent factors in applying this methodology:

> In conducting his analysis, Lerman analyzed, *inter alia*, Union Oil's monthly detailed income statement accounts (2002-2006), evidence of its annual terminal revenue by customer (2002-2006), daily dock traffic reports (2002-2006), and activity reports for the Beaumont area (2002-2006). Based on these and other records, interviews with terminal employees, and additional market research, Lerman used the forecast sales method of calculating lost profits, which estimates lost sales by calculating the revenue that would have been collected but for a given event and then subtracting actual sales. *See* ROMAN L. WEIL, ET AL., LITIGATION SERVICES HANDBOOK: THE ROLE OF THE FINANCIAL EXPERT 63 (4th ed. 2007). Specifically, Lerman considered two scenarios, each employing different assumptions to ascertain the volume of business the terminal lost as a result of the oil spill, in order to determine Union Oil's estimated lost profits.

*Id.* To the extent that the defense in *Union Oil* argued that plaintiff's expert should have considered other factors and data, the court held that this went to the weight rather than the admissibility of the expert's testimony. *Id.* at 5. In this case, the parties have not stipulated that the "but for" or "forecast sales" methodology should apply in this case, and Dr. Miller's report and deposition testimony do not address the applicability of either methodology to this case, but Defendants do not rely on this as a ground to strike his testimony. Accordingly, the court notes that Dr. Miller's report does not identify the steps of the "but for" or "forecast sales" methodology or the pertinent factors normally considered by experts in his industry in applying this methodology, but it does not rely on it as a ground for striking his testimony as unreliable.

**Memorandum Opinion and Order – Page 20**

64. **To determine the specific risk premium, I have considered, as an upper bound, the rate of return required by venture capitalists, who typically invest in riskier business ventures. By contrast, DB&A is an established firm.** A survey of available research indicates that the return typically required by venture capital investors ranges from approximately 25 percent to as much as 50 percent.

a) According to the Pepperdine University 2017 Private Capital Markets Report, the median return for a later stage VC investor was 25% (1st quartile was 15% and 3rd quartile was 50%).
b) According to the National Bureau of Economic Research, the average return for venture capital is 25%.
c) "Most venture capitalists or venture capital returns will expect to at least receive this 25 percent return on investment."
d) The target rate of return for a Venture Capital Target in the Bridge/IPO stage is typically 25-35%.
e) Per a 2013 AICPA study, the VC required rate of return ranges from 20 to 35% (citing three different studies, one ranged 25%-35%, another 20% to 35%, and the third 20% to 30%).
f) Investors in late-stage companies (defined as those that have raised capital at valuation greater than $100 million) ". . . target a 20% plus gross IRR on their winner investments."
g) "A minimum 'respectable' return for a VC fund is 20% per year."

65. **Since venture capital firms invest primarily in startups, which generally carry more risk than an established company such as DB&A, I have relied on the lower end of the range (i.e., 25%) to estimate a specific risk premium for DB&A. Since the estimates of the typical minimum return demanded by venture capitalists reflect both a CAPM-based discount rate and a specific risk premium, I have deducted the discount rate for a generic equity investment from each to determine implied specific risk premiums. I have applied the average implied specific risk premium from these estimates of 14.06%.**

66. **The discount rate which results from application of the CAPM and the specific risk premium reflects the riskiness of DB&A's overall cash flows and varies from 20.61% to 21.82% based on the date of harm.** Application of the discount rate provides DB&A's net lost profits on a risk-adjusted basis which captures the probability that DB&A may not realize those cash flows. DB&A's resulting risk-adjusted net lost profits are presented on the following page (Table 6).

Pl.'s App. 33-38 (emphasis added and footnotes omitted).

Dr. Miller then proceeds to calculate what he refers to as Plaintiff's risk-adjusted net lost profits based on consideration of certain information and variables. He indicates in a footnote in

his report that, "[b]ased on a discussion with DB&A personnel, I understand DB&A does not have any valuations of its business. Accordingly, I have applied the CAPM to determine the discount rate." Pl.'s App. 34 n.197.  In other footnotes, he cites to Richard A. Brealey, Stewart C. Myers, & Franklin Allen, Principles of Corporate Finance (12th ed. 2016).  He also cites to several articles, including the Damodaran valuation article discussed by the parties. Pl.'s App. 34-35, nn.195-203. It is readily apparent from Dr. Miller's description of these articles in the footnotes of his report that they apply to venture capital risk and evaluation of young start-up companies, not traditional nonpublic companies like DB&A that have no business valuations history.  *See id.*

When asked in his deposition—"[A]re there any treatises, peer-reviewed papers, or . . . other industry materials that you rely on that supports the application of the models . . . in [p]aragraph 62 of your report and 63 in your report in a lost profits analysis?"—Dr. Miller responded:

> Well, certainly the . . . text that I cite in footnotes to Paragraph 63 and 62 and the exhibits in that section would speak to the application of a Capital Asset Pricing Model to account for the riskiness of cash flows, which is what I'm doing here.  It's just that this setting here happens to be in a lost profits claim. But the fundamental concept of the uncertainty and risk associated with those cash flows is constant.

Pl.'s App. 108.  This response, though, does not directly address the question of whether there is any industry support for his decision to apply the CAPM in this case using venture capital returns in developing the risk premium or discount rate to arrive at a lost profit damages amount.  Dr. Miller's report is also devoid of any explanation as to why he believes it is appropriate to apply the CAPM to determine or estimate DB&A's discount rate, and his unsupported assertion that he applied the CAPM because "DB&A does not have any valuations of its business" is conclusory. Pl.'s App. 34 n.197.  Likewise, his statement that "[d]epending on the date of harm, the CAPM-based discount rate ranges from 6.56% to 7.76%" is conclusory.  *Id.* at 34.  Even assuming that

the use of the CAPM is a generally accepted practice in the industry for determining the discount rate to calculate lost profit damages, Dr. Miller does not set forth the steps for this methodology, so the court has no way of knowing whether he applied the methodology correctly in calculating the discount rate in this case.

Similarly, Dr. Miller states that he arrived at an implied specific risk premium of 14.06 percent based on his estimates of rates of return required by venture capitalists, who typically invest in riskier start-up business ventures, but he does not explain why his use of venture capital rates of return are appropriate here, particularly in light of his acknowledgment that, "[b]y contrast, DB&A is an established firm." *Id.* at 34-35. Thus, the court has no way of assessing whether Dr. Miller's testimony and conclusions regarding Plaintiff's lost profit damages are the product of reliable principles and methods that were correctly applied in this case. *See* Fed. R. Evid. 702(c).

Contrary to Plaintiff's assertion, Defendants were not required to come forward with any evidence or legal authority regarding alternative methodologies or to establish that CAPM is an unacceptable method for calculating the discount rate *in this case*; rather, the burden of establishing the reliability of Dr. Miller's testimony is Plaintiff's alone. Moreover, evidence as to whether CAPM is an unacceptable method in Dr. Miller's industry for determining the discount rate *to be applied in this case for purposes of calculating Plaintiff's alleged lost profit damages* should be coming from Plaintiff's expert, not Plaintiff's counsel. Almost 40 years ago, the Fifth Circuit stated unambiguously, "The trial judge ought to insist that a proffered expert bring more to the jury than the lawyer can offer in argument." *In re Air Crash Disaster at New Orleans, La*., 795 F.2d 1230, 1233 (5th Cir. 1986). Argument by counsel, no matter how esoteric or erudite, cannot serve as a substitute for establishing that a proponent has met its burden for the admissibility of evidence under Rule 702, as that duty falls exclusively on the expert.

Once again, Plaintiff attempts to fill this gap in its expert's report by argument and reference to scholarly authorities and citations to other cases involving the CAPM. None of the three cases cited by Plaintiff—*ASARCO*, *Steiner* and *Hodas*—support the conclusion that the CAPM is used to determine the discount rate for purposes of calculating lost profit damages for lost business opportunities. Of these three cases, only *ASARCO* involved a *Daubert* motion and issue of which methodology should apply in determining the applicable discount rate. None of the cases, however, involved the use of the CAPM for determining the discount rate in calculating lost profit damages based on lost business opportunities.  *Steiner* and *Hodas* both involved mergers and the use of the CAPM to calculate the discount rate for purposes of evaluating the fair or market value of corporate stock.  *See generally, Steiner Corp.*, 5 F. Supp. 2d 1117, 1120-38; *Hodas*, 1992 WL 364682, at *1.  Likewise, *ASARCO* involved the valuation of publicly traded corporate stock, and the court's decision to apply the CAPM was based on expert testimony regarding valuation industry practice, not attorney citations to legal authority.  *ASARCO LLC*, 396 B.R. at 357-62 & n.88.

Thus, while it may be common in the financial or valuation industry to use the CAPM in determining a discount value, Plaintiff's "one size fits all" argument is insufficient to show that— application of the CAPM to the facts of this case and in the manner advocated by Dr. Miller using venture capital returns in developing the risk premium—is appropriate or the type of application of the CAPM that is generally accepted or recognized in his field or industry. This is particularly so, given the complete absence of evidence and any explanation in this regard from Dr. Miller, as well as the lack of any evidence that the steps he took in applying the CAPM in determining a discount value and developing the risk premium were done in accordance with his unexplained methodology because, as explained, the court cannot simply take his or Plaintiff's counsel's "word

for it" that he correctly applied the methodology or that the claimed bases support his opinion. Fed. R. Evid. 702 advisory committee's notes (2000 amendments); *Pipitone*, 288 F.3d at 245-47. To do so would require the court to abdicate its gatekeeping obligation.

Accordingly, Dr. Miller's testimony and opinion regarding Plaintiff's lost profit damages are unreliable and inadmissible under Rule 702. The court, therefore, **grants** Defendants' Daubert Motion to Exclude Stuart B. Miller, Ph.D.'s Report, Opinions, and Testimony (Doc. 158) and **strikes** his testimony for all purposes in this action.

## III.    Summary Judgment Motions

As indicated, Defendants have moved for summary judgment on all of Plaintiff's remaining claims for: (1) breach of contract against Mr. Pethick; (2) breach of fiduciary duty and aiding and abetting against Mr. Pethick; (3) misappropriation of trade secrets against Defendants; (4) tortious interference with existing contract against Powers; (5) tortious interference with prospective relations against Defendants; (6) unjust enrichment against Defendants. Defendants also move for summary judgment on Plaintiff's request for attorney's fees and injunctive relief. As explained below, Defendants are entitled to judgment as a matter of law on all the remaining claims against them. Some of Plaintiff's claims are preempted. Others claims fail because Plaintiff did not come forward with evidence to raise a genuine dispute of material fact regarding necessary claim elements necessary to avoid summary judgment. Plaintiff also abandoned some claims and waived certain issues by failing to address them in responding to Defendants' summary judgment motions. Additionally, because none of Plaintiff's claims survive, the parties' arguments regarding Plaintiff's entitlement to attorney's fees or injunctive relief are moot, as prevailing on the merits of one or more of its claims is a prerequisite for both of these types of relief at this stage of the litigation.

A.      **Summary Judgment Standard**

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Mutual Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). On the other hand, "if the movant bears the burden of proof on an issue, either because he is the plaintiff or as a defendant he is asserting an affirmative defense, he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original). "[When] the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine [dispute] for trial.'" *Matsushita*, 475 U.S. at 587 (citation omitted). Mere conclusory allegations are not

competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996). Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994).

The party opposing summary judgment is required to identify specific evidence in the record and to articulate the precise manner in which that evidence supports his or her claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id*. If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## B.   Defendants' Motions for Summary Judgment (Docs. 153, 155)

### 1.   Breach of Contract (Mr. Pethick)

Defendant Pethick contends that, regardless of the bases for Plaintiff's breach of contract claim, he is entitled to summary judgment on this claim.  He contends that this claim fails as a matter of law because there is no evidence Plaintiff suffered any damages as a result of his alleged breaches.  Plaintiff responds:

> The Confidential Information Pethick shared and used during and after his employment with DB&A, as described herein, created a competitive advantage for Pethick and Powers in obtaining business. *See* APP'X 008-010; APP'X 015-16. There were, in fact, legal damages caused to DB&A in the form of diverted lost

business opportunities and resulting lost profits and loss of goodwill directly traceable to Pethick's wrongful conduct. The evidence is sufficient to create a material fact issue precluding summary judgment.

Pl.'s Corrected Resp. 14 (Doc. 177).

Mr. Pethick references Texas law, and Plaintiff in response to Mr. Pethick's summary judgment motion does not dispute that Texas law governs its claim for breach of contract with respect to the parties' Agreements.  To prevail on a claim for breach of contract under Texas law, the plaintiff must prove: "(1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *Smith Int'l, Inc. v. Egle Grp., LLC*, 490 F.3d 380, 387 (5th Cir.2007) (quoting *Valero Mktg. & Supply Co. v. Kalama Int'l*, 51 S.W.3d 345, 351 (Tex. App.–Houston [1st Dist.] 2001, no pet.)).

Plaintiff's unsupported assertion that "[t]here were, in fact, legal damages caused to DB&A in the form of diverted lost business opportunities and resulting lost profits and loss of goodwill directly traceable to Pethick's wrongful conduct" is not evidence that it sustained damages as a result of Mr. Pethick's alleged breach of the parties' Agreements.  Thus, contrary to Plaintiff's assertion, this argument is not sufficient to create a genuine dispute of material fact regarding damages.  Moreover, the court has already excluded Plaintiff's expert testimony regarding alleged lost profits, and, in any event, Dr. Miller made clear that his testimony and opinion regarding lost profits damages were limited to Plaintiff's claim for alleged misappropriation of trade secrets as it pertained to Arcosa, Beyond Meat, and Sechan.  Accordingly, Mr. Pethick is entitled to judgment as a matter of law on this claim, which will be dismissed with prejudice.  Further, having determined that Plaintiff's contract claim fails on this ground, the court need not address the parties' other arguments regarding this claim.

**Memorandum Opinion and Order – Page 28**

### 2. Breach of Fiduciary Duty (Mr. Pethick) and Aiding and Abetting (Powers)

Defendants raise a number of grounds in support of their request for summary judgment on Plaintiff's claims for alleged breaches of fiduciary duty and aiding and abetting. "The elements of a breach of fiduciary duty claim [under Texas law] are: (1) a fiduciary relationship must exist between the plaintiff and defendant; (2) the defendant must have breached his fiduciary duty to the plaintiff; and (3) the defendant's breach must result in injury to the plaintiff or benefit to the defendant." *D'Onofrio v. Vacation Publ'ns, Inc.*, 888 F.3d 197, 215 (5th Cir. 2018) (citations omitted). It is well settled under Texas law, that, "whe[n] a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tortfeasor with the fiduciary and is liable as such." *Kinzbach Tool Co. v. Corbett–Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942). "Knowing participation in breach of fiduciary duty is a derivative claim, requiring an underlying breach of fiduciary duty, in which the defendant knowingly participates." *Straehla v. AL Glob. Servs, LLC*, 619 S.W.3d 795, 804 (Tex. App.—San Antonio 2020, pet. denied) (citing *Kinzbach Tool Co.*, 160 S.W.2d at 514).

Mr. Pethick moves for summary judgment on Plaintiff's breach of fiduciary claim against him based on the following grounds: (1) TUTSA preempts any fiduciary claim based on use of information; (2) Plaintiff's remaining theory for breach of fiduciary duty fails as a matter of law because there is no evidence of dual employment; and (3) alternatively, Plaintiff's claim for breach of fiduciary duty fails because there is no evidence that his conduct damaged Plaintiff. Powers argues that it is entitled to summary judgment on Plaintiff's aiding and abetting claim because Plaintiff's claim for breach of fiduciary duty fails for the reasons urged by Mr. Pethick.

Regarding Mr. Pethick's second ground for summary judgment, Plaintiff contends that Mr. Pethick actively worked to steal its meetings with Triumph and Cobham for himself and Powers

and, thus, is not entitled to summary judgment with respect to its breach of fiduciary duty based on this conduct. For support, Plaintiff points to the following evidence of Mr. Pethick's conduct in stealing meetings to show that his actions constitute a breach of fiduciary duty precluding summary judgment on this ground:

> On May 8, 2020, Pethick emailed Jack Stevens and Arne Vogt at Cobham about setting up a meeting with Powers for June. APP'X 146-47; *see* APP'X 148-49 (Pethick confirming meeting on alleged first day at Powers). On May 11, 2020, Pethick emailed Triumph confirming a meeting for June 4, 2020. APP'X 065-67. Pethick did not disclose either development to DB&A. Instead, Pethick deleted the Triumph meeting from the Salesforce Database altogether. APP'X 070-73.

> On May 12, 2020, Powers Director of Business Development, Bill Nobes, emailed Triumph to move the June 4th meeting from DB&A and to Powers. APP'X 466. In the email, Nobes noted that his email was sent at Pethick's direction. *Id.*; *see* APP'X 450-52. Further, Nobes acknowledges that Triumph was working with Veronica Warlick, DB&A's BDR assigned to Triumph. *See* APP'X 455-56. In fact, Nobes admitted that Pethick told him about the meeting prior to Pethick's departure from DB&A. *See* APP'X 451-54.

> On May 15, 2020, DB&A confronted Pethick about the email from Nobes. APP'X 011; APP'X 316; APP'X 389, 397-98. Pethick admittedly did not deny the contents of the email, he simply resigned. APP'X 319; *see* APP'X 389.

Pl.'s Corrected Resp. 16.

As Defendants correctly note in their joint reply: (1) Plaintiff failed to address Mr. Pethick's preemption argument under TUTSA; (2) the only breach of fiduciary duty theory alleged in Plaintiff's Second Amended Complaint that does not pertain to the confidential information asserted by Plaintiff to be trade secrets is its allegation that Mr. Pethick was simultaneously employed by Plaintiff and Powers; however, Plaintiff did not address this theory and presented no evidence in support of this theory in responding to Defendants' summary judgment motions and, therefore, abandoned it; and (3) any breach of fiduciary duty claim based on Mr. Pethick's conduct with respect to Cobham is not before court because Plaintiff's Third Amended Complaint (Doc. 133) was stricken as a result of filing the amended pleading without leave of court (Doc. 134), and

**Memorandum Opinion and Order – Page 30**

the court subsequently denied Plaintiff's request for leave to file its proposed Third Amended Complaint containing the new allegations regarding Cobham.

The court also notes that, while Plaintiff alleges in its Second Amended Complaint (Doc. 95) that Mr. Pethick e-mailed and scheduled meetings with Triumph in an attempt to steal, for himself and Powers, Truimph's business, these allegations were made in support of its other claims, not its breach of fiduciary duty claim. Even if the court had permitted Plaintiff to file its Third Amended Complaint, the allegations in that proposed pleading regarding meetings with Triumph and Cobham were not an alleged basis for Plaintiff's breach of fiduciary duty claim. Thus, any breach of fiduciary duty claim based on the theory that Mr. Pethick e-mailed and scheduled meetings with Triumph and Cobham are not properly before the court.

Moreover, a party is not entitled to recovery under any legal theory that would fit allegations of fact contained somewhere in the operative pleadings. Following a "blind-hog-occasionally-finds-an-acorn approach would play havoc with trial procedure and would negate the narrowing and winnowing process that occurs under the present federal rules." *Southern Constructors Grp., Inc. v. Dynalectric Co.*, 2 F.3d 606 (5th Cir. 1993). Plaintiff does not explain why it should be allowed to present a theory of recovery for its breach of fiduciary duty claim at this late stage, and to allow Plaintiff to present a new theory of recovery to support its breach of fiduciary duty claim in response to Defendants' summary judgment motion based on facts alleged in its pleadings with respect to other claims would defeat this narrowing process and unnecessarily delay the resolution of this litigation. *See id.*

Accordingly, Plaintiff waived any argument it may have had regarding Mr. Pethick's summary judgment preemption ground under TUTSA by failing to respond to it. *See Keenan v.*

*Tejeda*, 290 F.3d 252, 262 (5th Cir. 2002) (noting that "an issue raised in the complaint but ignored at summary judgment may be deemed waived [ ]").

Even if not waived, the court determines, based on the same reasoning set forth in its prior memorandum opinion and order (Doc.  129 at 8-12) that TUTSA preempts any breach of fiduciary duty claim by Plaintiff based on Mr. Pethick's alleged use of DB&A's confidential information. Likewise, Plaintiff waived and abandoned any breach of fiduciary duty claim based on the theory that Mr. Pethick was simultaneously employed by Plaintiff and Powers by not addressing this or Mr. Pethick's related arguments in responding to Defendants' summary judgment motions.  *See Keenan*, 290 F.3d at 262; *See Black v. North Panola Sch. Dist.*, 461 F.3d 584, 588 n.1 (5th Cir. 2006) (stating that the plaintiff abandoned a claim when she failed to defend it beyond her initial pleading). Additionally, for the reasons explained, the only basis relied on by Plaintiff in responding to Defendants' summary judgment motions to dismiss its breach of fiduciary duty claim—Mr. Pethick's conduct in e-mailing and scheduling meetings with Triumph and Cobham in attempt to steal their business—is not properly before the court such that the undersigned declines to consider this theory in ruling on Defendants' motions.

Because Plaintiff's breach of fiduciary duty claim against Mr. Pethick fails, so too does its derivative aiding and abetting claim against Powers that is premised on Plaintiff's breach of fiduciary duty claim. *See Straehla*, 619 S.W.3d at 804 (citing *Kinzbach Tool Co.*, 160 S.W.2d at 514). As Plaintiff has failed to raise a genuine issue of material fact as to any of these grounds, Defendants are entitled to judgment as a matter of law on Plaintiff's breach of fiduciary duty and aiding and abetting claims, which will be dismissed with prejudice.  Having determined that these claims fail for the reasons stated, it is not necessary for the court to address the parties' arguments regarding damages.

### 3.    Misappropriation of Trade Secrets (Defendants)

Defendants contend that they are entitled to summary judgment on Plaintiff's claim for misappropriation of trade secrets for a number of reasons, including that Plaintiff has no evidence that their alleged misappropriation of trade secrets caused it to suffer damages.  Plaintiff disagrees and argues, based on Dr. Miller's expert report, that it sustained lost profit damages as a result of Defendants' conduct in misappropriating its trade secrets.

"To establish trade secret misappropriation in Texas, a plaintiff must show '(a) the existence of a trade secret; (b) a breach of a confidential relationship or improper discovery of the trade secret; (c) use of the trade secret; and (d) damages.'" *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 583 (5th Cir. 2013) (quoting *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1123 (5th Cir.1991)); *see also Transverse, L.L.C. v. Iowa Wireless Servs., L.L.C.*, 753 F. App'x 184, 190 (5th Cir. 2018) (applying Texas law and concluding that the plaintiff's claim for misappropriation of trade secrets failed because "Proof of damages is an essential—and in this case missing—element of each of Transverse's three causes of action. . . . Even assuming *arguendo* that the 'flexible' damages approach of trade secret misappropriation [advocated by the plaintiff] applies, Transverse failed to prove damages." (citation omitted).

As the court has already excluded as inadmissible Dr. Miller's testimony—the only evidence of damages that Plaintiff relies upon to raise a fact issue with respect to its trade secret misappropriation claim—this claim necessarily fails as a matter of law, and Defendants are entitled to judgment as a matter of law on the claim, which will be dismissed with prejudice.  Further, as the court has determined that it should be dismissed for this reason, it is not necessary to discuss the parties' remaining arguments regarding this claim.

### 4.  Tortious Interference with Existing Contract (Powers)

Powers moved for summary judgment on Plaintiff's claim against it for tortious interference with an existing contract.  As Defendants correctly note, Plaintiff did not address this claim in responding to Powers' summary judgment motion.  Plaintiff has, therefore, abandoned the claim and waived any arguments it may have regarding this claim, and Powers is entitled to judgment as a matter of law as to this claim, which will be dismissed with prejudice. *See Black*, 461 F.3d at 588 n.1; *see also Keenan*, 290 F.3d at 262.

### 5.  Tortious Interference with Prospective Relations (Defendants)

Defendants argues that Plaintiff's claim for tortious interference with prospective relations under Texas law fails as a matter of law because Plaintiff's has no evidence of damages as required to prevail on this tortious interference claim, and it cannot rely only on its damage model because it is limited to Plaintiff's misappropriation trade secret claim.   As Defendant correctly note in their reply brief, Plaintiff does not address this issue in responding to their summary judgment motion, which is fatal to this claim.[10]   The court, therefore, agrees that Plaintiff not only waived this issue in failing to address it, but also failed to raise a genuine dispute of material fact regarding the damages element of its claim for tortious interference with prospective relations.  Accordingly, Defendants are entitled to judgment as a matter of law on this claim, which will be dismissed with prejudice.   Consequently, it is not necessary for the court to address the parties' remaining arguments regarding this claim.

---

[10] *See Coinmach Corp. v. Aspenwood Apartment Corp.*, 417 S.W.3d 909, 923 (Tex. 2013) ("To prevail on a claim for tortious interference with prospective business relations, the plaintiff must establish that (1) there was a reasonable probability that the plaintiff would have entered into a business relationship with a third party; (2) the defendant either acted with a conscious desire to prevent the relationship from occurring or knew the interference was certain or substantially certain to occur as a result of the conduct; (3) the defendant's conduct was independently tortious or unlawful; (4) the interference proximately caused the plaintiff injury; and (5) the plaintiff suffered actual damage or loss as a result.") (citations omitted).

**Memorandum Opinion and Order – Page 34**

6.        **Unjust Enrichment (Defendants)**

Mr. Pethick contends as follows that Plaintiff's unjust enrichment claim or theory of recovery is preempted by the TUTSA:

> Plaintiff's claim for unjust enrichment also fails as a matter of law because it is preempted by TUTSA. Plaintiff alleges that Mr. Pethick unlawfully used Plaintiff's confidential information to solicit Plaintiff's clients and employees. [Dkt. 95, ¶ 90]. To the extent this claim is based on this allegation, it is wholly preempted and fails as a matter of law for the reasons discussed in preceding sections. In fact, the Court has already dismissed this claim as to Powers because it is preempted by TUTSA. [Dkt. 129, p. 20]. Mr. Pethick is similarly entitled to summary judgment on this claim to the extent it is based on alleged misappropriation.

Pethick Br. 45.

> Plaintiff responds as follows:

> Texas law does not provide an independent claim for unjust enrichment. However, Defendants have not demonstrated that DB&A is precluded as a matter of law from recovering unjust enrichment damages as a result of their trade secret misappropriation claim. Further, DB&A is entitled to plead in the alternative, and to the extent that DB&A may fail to recover on their trade secrets claim, there is no TUTSA preemption. Thus, DB&A can seek damages under a theory of unjust enrichment. *See ZeniMax Media, Inc. v. Oculus VR, LLC*, 166 F. Supp. 3d 697, 706 (N.D. Tex. 2015).

Pl.'s Corrected Resp. 30.

As the court explained in its prior memorandum opinion and order (Doc. 129 at 10), TUTSA "displaces conflicting tort, restitutionary, and other law of [Texas] providing civil remedies for misappropriation of a trade secret," but it "does not affect: (1) contractual remedies, whether or not based upon misappropriation of a trade secret; [or] (2) other civil remedies that are not based upon misappropriation of a trade secret[.]" Tex. Civ. Prac. & Rem. Code § 134A.007. The court also concluded in addressing Powers' motion to dismiss on this ground that:

> Regardless of the labels used by Plaintiff in its pleadings to describe the information at issue, its claims and theories of relief based on conspiracy (Count 8) and unjust enrichment ([Count] 9) are premised entirely on the alleged

misappropriation of DeWolff's trade secrets and the type of confidential information that qualifies as trade secrets under TUTSA. These claims are, therefore, preempted.

Doc. 129 at 11.  The same result applies with respect to Plaintiff's unjust enrichment claim against Mr. Pethick, as the allegations as to both Defendants for this claim or theory of recovery is identical.

Plaintiff's argument based on *ZeniMax Media* does not justify a different result or require the application of a different rule of law than that set forth above for TUTSA preemption.  Unlike *ZeniMax Media*, Plaintiff's unjust enrichment claim is based on the same allegations and conduct supporting its trade secrets misappropriation claim.  *ZeniMax Media* is, therefore, distinguishable and inapplicable to the facts of this case.

Accordingly, Mr. Pethick is entitled to summary judgment as to Plaintiff's unjust enrichment claim on the ground that it is preempted by TUTSA.  Defendants also contend that Powers is entitled to judgment as a matter of law on this claim in the event that the court interprets Plaintiff's summary judgment response as asserting a new alternative legal theory.  Plaintiff has not requested the court to reconsider its prior ruling as to Powers, and the court sees no reason to do so.  Plaintiff's claim or request for relief based on the theory of unjust enrichment will be dismissed with prejudice as to Mr. Pethick, and the court's prior dismissal with prejudice of this claim against Powers stands.

### 7.    Plaintiff's Request for Attorney's Fees and Injunctive Relief

Defendants contend that Plaintiff is not entitled to attorney's fees for its claims in this case, and it abandoned its request for injunctive relief by not addressing this argument in its summary judgment response.  As Defendants correctly note, Plaintiff waived this issue and/or abandoned its request for injunctive relief by not addressing it in its summary judgment response.  *See Black*,

461 F.3d at 588 n.1; *see also Keenan*, 290 F.3d at 262. Moreover, even though Plaintiff disagrees with Defendants' argument regarding its entitlement to attorney's fees, this issue and the issue of whether Plaintiff is entitled to injunctive relief are both **moot** in light of the court's determination that Defendants are entitled to judgment as a matter of law on all claims asserted by Plaintiff in this action.  The issues are moot, as Plaintiff has not prevailed on any of its claims in this action, as necessary to be entitled to recover attorney's fees and injunctive relief at this stage of the litigation.

### C.      Plaintiff's Motion for Partial Summary Judgment (Doc. 157)

Plaintiff asserts that, in its Answer, Powers alleges a claim for attorney's fees under Texas Business and Commerce Code, Section 15.51(c). Plaintiff contends that it is entitled to summary judgment on Powers' claim for attorney's fees because section 15.51(c) does not apply to new employers such as Powers; Powers does not qualify as a "promisor" under this statute; and Powers was not a party to the employment agreements at issue and had no contractual relationship with DeWolff. Plaintiff, therefore, argues that Powers has no standing to seek such fees.  Powers disagrees on the ground that Defendants have made clear that the fees they have incurred in this case were in the joint defense of the interrelated claims asserted by Plaintiff for breach of contract and tortious interference with that contract.  The court **denies without prejudice** Plaintiff's request for summary judgment on this ground, as the parties' arguments regarding Defendants' or Powers' entitlement to attorney's fees can be addressed postjudgment in accordance with Federal Rule of Civil Procedure 54(d)(2).

### IV.    Conclusion

For the reasons stated, the court **grants** Defendants Justin Pethick and The Randall Powers Company's Daubert Motion to Exclude Stuart B. Miller, Ph.D.'s Report, Opinions, and Testimony

(Doc. 158), and his testimony is, therefore, **excluded**; **grants** Defendant Justin Pethick's Motion for Summary Judgment (Doc. 153); **grants** Defendant The Randall Powers Company's Motion for Summary Judgment (Doc. 155); and **denies without prejudice** Plaintiff DeWolff, Boberg & Associates, Inc.'s Motion for Summary Judgment on Defendant The Randall Power Company's Claim for Attorney's Fees (Doc. 157). The court, therefore, **dismisses with prejudice** Plaintiff's remaining claims in this action against Defendants. In accordance with Rule 58 of the Federal Rules of Civil Procedure, judgment will issue by separate document.

      **It is so ordered** this 31st day of March, 2024.

Sam A. Lindsay
United States District Judge